**Julius L. FINKELSTEIN, Plaintiff,**

v.

**Louis P. BERGNA, et al., Defendants.**

**Nos. C 83–5125 TEH–(SC),
C 84–1391 TEH–(SC).**

United States District Court,
N.D. California.

Oct. 2, 1992.

Alan Exelrod, solo practitioner, and Sanford Rosen and Samuel Miller of Rosen, Bien & Asaro, San Francisco, Cal., for plaintiff.

Steven Woodside, County Counsel, Ann Miller Ravel,. San Jose, Cal., Chief Asst. County Counsel, and Michael Marron and Martin Dodd of Marron, Reid & Sheehy, San Francisco, Cal., for defendant County of Santa Clara.

Craig Brown, San Jose, Cal., for defendant Louis Bergna.

## ORDER RE: OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS RE: ATTORNEYS' FEES

CONTI, District Judge.

### I. INTRODUCTION

Both Plaintiff Julius L. Finkelstein ("plaintiff") and Defendants Louis P. Bergna and the County of Santa Clara ("defendants") object to the findings and recommendations of Magistrate Judge Wayne D. Brazil filed on July 31, 1992 (the "Recommendations"). As Chief Judge Henderson has recused himself from consideration of these motions, the matter has been referred to this court.

### II. FACTS

This fee dispute is (apparently) the final episode in a lengthy litigation that began in 1983. The underlying suit alleged causes of action against both the defendants and three others who were subsequently dismissed. The original suit alleged a number of causes of action,[1] many of which were subsequently dismissed in a lengthy series of motions and appeals.

A jury in August of 1991 awarded plaintiffs $1,175,000, finding against the County on the due process property rights claim, and against Bergna on the two due process claims and the punitive damage claim. A

---

1. The causes of action included violation of due process property rights and liberty interests, violation of First Amendment rights, violation of California Labor Code §§ 1101 and 1102 and County Charter Art. VII §§ 700 and 713, defamation, false light invasion of privacy, conflict of interest, conspiracy, and punitive damages.

post-judgment settlement reduced that award to $1,050,000, and on September 23, 1991, the court ordered that plaintiff was to recover reasonable attorneys' fees and costs. The determination of those fees and costs was referred to Magistrate Judge Brazil, who on July 30, 1992 issued extensive findings of fact and recommendations that the court award plaintiff $578,011.35 in attorneys' fees and $22,665.46 in costs, for a total of $600,676.81. Both parties object to portions of that recommendation.

## III. DISCUSSION

The plaintiff objects to Magistrate Brazil's recommendations in several regards. First, he objects to the recommended hourly rates for both Mr. Exelrod, who performed the vast majority of the work on plaintiff's behalf, and Ms. Dutton, who was an associate of Mr. Exelrod's early in the litigation. Second, he objects to the magistrate's recommendation that both costs and fees associated with one of two mock trials conducted by plaintiff's counsel be disallowed. Third, he objects to the recommended disallowal of certain miscellaneous costs.

The defendants, on the other hand, object to the magistrate's recommendation that fees be allowed for work done on theories of liability upon which the plaintiff did not ultimately prevail, arguing that the award should be reduced to reflect time spent on those theories.

Additionally, both sides address the question, not considered by the magistrate, of whether interest on the fees and costs should accrue as of the merits judgment date of September 23, 1991,[2] or only as of the quantification of the amount of fees and costs awardable.

We address each issue in turn.

2. In its order of that date, the court found plaintiff to be entitled to fees and costs, but referred the matter of the amount of such fees and costs to the magistrate.

3. Neither side disputes that, although the work in question began in 1983, it is appropriate to

### A. *Applicable Hourly Rates*

In his recommendations, Magistrate Brazil has set the hourly rate for Mr. Exelrod at $250. Mr. Exelrod had requested an hourly rate of $300, which he claimed to be a reasonable 1991 rate for the work he performed.[3] In arriving at the $250 figure, the magistrate found Mr. Exelrod's work to have been of the highest caliber, and thus that he was entitled to compensation at the prevailing rate for similar services rendered by the top members of the field. The difficulty, as the magistrate recognized, lies in determining what the relevant "field" is for purposes of assessing the prevailing rate.

This determination is not as straightforward as it may seem. Where, as here, the relevant specialty (in this case, civil rights actions) consists entirely of cases governed by fee-shifting statutes, there is no "control group" market for non-contingent services. Thus the court, by necessity, must select an analogous field from which to draw comparable rates. The magistrate in this case, after exhaustive analysis, found that Exelrod's work should be compensated at "hourly rates that the best civil litigators can attract in our community when they are involved in truly complex cases." Recommendations at 12. We find this reasoning persuasive, and concur in the finding that a rate of $300 per hour (or even $330) is reasonable in the San Francisco market for senior partners of Mr. Exelrod's experience in complex litigation.

The analysis does not stop there, however. As the magistrate emphasized, Mr. Exelrod is (for the most part) a solo practitioner, and as such performed not only work that, in a large-firm environment, would be billed at premium rates, but also work that, in such a firm, would be handled by junior associates or non-lawyers at considerably lower rates. While a rate of $300

compensate all the work at rates applicable at the time of judgment, in order to allow for the rate of inflation over that period. *Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 716, 107 S.Ct. 3078, 3081, 97 L.Ed.2d 585 (1987).

for a senior partner .is reasonable, it is reasonable only in an environment where that senior partner participates only in higher-level tasks, and delegates more mundane tasks to lower-paid employees. In other words, the relevant inquiry is not "what would the senior partner bill if this case had been handled by a large firm?" but rather "what would a large firm with a $300 top rate bill, *in the aggregate,* for the work performed?" The answer to that question is properly found, as the magistrate held, by reference to the "blended" rate for all tasks charged by such firms.

Plaintiff's own exhibits, as summarized at page 15 of the Recommendations, reveal that firms with a top rate of $300 per hour bill, in the aggregate, closer to $200 per hour on complex litigation. As such, even the alleged gains in efficiency by having one attorney do all the work, coupled with the unbilled work allegedly done by the plaintiff himself, do not justify a rate in excess of $250 per hour for Mr. Exelrod's time. Plaintiff's claim that no large firm in fact was willing to take this particular case does not alter the calculus; the court must nonetheless approximate the market rate for the services.

Nor does *United States v. City and County of San Francisco,* 748 F.Supp. 1416 (N.D.Cal.1990) compel a different result. While in that case the court questioned the efficiency of the "pyramidal staffing pattern" of larger firms, the issue in that case was whether individual attorneys should be compensated at varying rates for differing work appropriate to their own abilities. Much of the "legwork" in that case was in fact done by uncompensated or significantly less compensated law students. By analogy, the question there was whether the senior partner should bill different rates for depositions, research, and trials (all properly done by that senior partner in the first place), not whether the associates (law students) should be paid at senior partner rates.

Accordingly, this court adopts the magistrate's recommendation that Mr. Exelrod be compensated at an hourly rate of $250.

Similarly, the court adopts the recommendation that Ms. Dutton's work be compensated at the rate of $110 per hour. Her work was performed during her first year of practice, and plaintiff does not dispute that the figure of $110 per hour is in line with current rates for such associates. The court concurs with the magistrate's opinion that this rate adequately compensates Ms. Dutton for any delay in payment.

### B. *Hours for Claims on which Plaintiff Did Not Prevail*

■ Defendants challenge the magistrate's recommendation that Mr. Exelrod be compensated for work done on theories of liability upon which the plaintiff did not ultimately prevail. In this case, however, all of the legal theories put forward arose from the same nucleus of operative facts, and the result obtained cannot possibly be described as a partial or limited victory. Indeed, the judgment obtained exceeded by a factor of more than three the defendants' *final* settlement offer, made after determination of liability. The instant case, which "involve[s] a common core of facts or [is] based on related legal theories ... cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983).

The magistrate correctly found, in an extensive and well reasoned discussion (Recommendations at 21–39), that virtually all of the effort expended by Mr. Exelrod was part of a "seamless web" of interrelated claims, and that to disallow some portion as unrelated to the claim upon which he prevailed would impermissibly force plaintiffs to choose between abandoning all but their most promising claim (a choice nearly impossible except in hindsight) on the one hand, and undertaking representation for which they would likely be only partially compensated on the other. Rather than revisit that analysis here, the court adopts the magistrates reasoning and recommendation as its own. No reduction shall be

made in fees based upon alternate theories of liability.[4]

### C. *Fees and Costs Associated with Mock Trials*

██ Plaintiff, in preparation for trial, conducted two sets of mock trials and focus groups. The magistrate has recommended that the fees and costs associated with the first of those mock trials be disallowed as not reasonably incurred. Plaintiff challenges this finding.

Mr. Exelrod has stated that the first of these mock trials addressed liability questions, while the second was for assessment of damages issues. However, as the magistrate notes, at the time of the first mock trial the liability issue was all but decided, pending only a motion for reconsideration at the Ninth Circuit. As such, the prudent course would have been to forego, or at least postpone, any mock trial on liability questions. Accordingly, we concur with the magistrates reduction of fees and costs on this basis.

### D. *Other Costs Disallowed by Magistrate*

██ Plaintiffs also challenge the magistrate's disallowal of other costs claimed, specifically $10,417.21 in mock jury costs, $255.24 in hearing transcript costs paid to the court reporter, $1,074.54 paid for service and copying of subpoenas, and an additional $584 for service of subpoenas.[5] Plaintiff claims that the magistrate incorrectly interpreted *Thornberry v. Delta Air Lines, Inc.,* 676 F.2d 1240 (9th Cir.1982). Under *Thornberry,* plaintiff maintains, he should be compensated for all costs that would normally be paid by the client, unless specifically *prohibited* by statute. This contention, however, overstates the holding in *Thornberry;* such costs are recoverable only if they would be paid by the

client *to the attorney* as part of the "overhead implicit in the attorney's hourly fee." *Burt v. Hennessey,* 929 F.2d 457, 459 (9th Cir.1991) (holding, inter alia, costs of filing and service not recoverable). Thus, rather than "failing to articulate a coherent distinction between those costs it allows and those costs it rejects," the magistrate's recommendation correctly distinguishes between those costs which are part of the overhead implicit in an attorney's fees, and those that are merely a "pass-through" of payment for third-party services. The magistrate correctly disallowed the amounts in question.

### E. *Interest on Fees*

██ The magistrate's recommendations do not include any determination of the date from which interest on the fees and costs is to run. Plaintiff maintains that interest should run from September 23, 1991, the date of the initial judgment finding plaintiff entitled to an unspecified amount of fees. At that time, the question of the appropriate amount was referred to Magistrate Brazil. Defendants maintain that interest should not run until the exact amount of fees is set, and thus that no interest should accrue until the entry of this order (or perhaps until resolution of any appeal of this order).

While no case in this circuit has squarely addressed this question, the weight of authority from other circuits is clearly on plaintiff's side. The case most on point is *Jenkins by Agyei v. Missouri,* 931 F.2d 1273 (8th Cir.1991). In a case squarely on fours with this one, that court held that "[i]nterest on an attorney fee award ... runs from the date of the judgment establishing the right to the award, not the date of the judgment establishing its quantum." *Id.* at 1276 (quoting *Mathis v. Spears,* 857 F.2d 749, 760 (Fed.Cir.1988)). Similarly,

---

**4.** The magistrate did find that a small number of hours had been spent on issues not necessary to the success of the suit, but found that the 5% voluntary reduction in total hours taken by plaintiff more than adequately accounted for those hours. Similarly, the magistrate disallowed time spent on claims against other defendants; neither side challenges that finding.

**5.** Plaintiff does not dispute that, under *West Virginia Hospital, Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), these amounts cannot be awarded as *costs,* as they are not expressly authorized by either 28 U.S.C. § 1920 or Local Rule 265–1. Rather, he seeks them as part of his *fees* pursuant to § 1988.

the court in *Copper Liquor, Inc. v. Adolph Coors Co.*, 701 F.2d 542 (5th Cir.1983) stated (quoting earlier fifth circuit opinions), "[t]he awarding of interest is in no sense a windfall. Because a dollar today is worth more than a dollar in the future, 'the only way [a party] can be made whole is to award him the interest from the time he should have received the money.'" (citations omitted). That case involved an award of fees that had been denied initially; only upon appeal were fees awarded, and yet the court applied interest from the date of the original judgment. While these opinions are not controlling, the court finds their reasoning persuasive.

More to the point, a finding that no interest is available between the judgment on the merits and the determination of the amount of fees would be both incongruous and contrary to the policies governing rate-setting. As noted above and in the magistrate's recommendations, fees are customarily awarded based upon current billing rates, in order to compensate the prevailing attorney for the delay in obtaining payment. Similarly, interest on fees is available after the determination of the amount for precisely the same reason; to compensate for any delay in payment. Were we to accept defendants' contentions here, it would create a bizarre situation in which compensation for delay in payment was available both before and after, but not during, the time period between judgment and setting of fees. The same policy considerations must apply in that intervening period; the prevailing attorney, having not been compensated for work that another attorney would have long since billed and collected upon, must be compensated for that delay, in order to put civil rights plaintiffs on an equal footing with other potential clients in seeking representation.[6]

The authorities cited by defendants do not hold differently. Defendants overstate

the holding in *Fleming v. County of Kane*, 898 F.2d 553 (7th Cir.1990) citing it for the proposition that, subsequent to a determination of eligibility but prior to quantification, a "claim for unpaid attorney's fees [is] unliquidated, and as such, not entitled to interest." *Id.* at 565. In fact, the court in that case was reviewing an award that allowed interest on fees from the date the services were rendered, not from the merits judgment date.[7] While that court held interest to be payable from the date of quantification, it did so without any discussion or consideration of the third alternative—interest from the date of entitlement.

Nor does *Bernardi v. Yeutter*, 754 F.Supp. 743, 749 (N.D.Cal.1990) (Conti, J.) support defendants' position. In that case, the decision as to entitlement to fees and the determination of the amount of fees were on the same day; the court held that interest was to run from that date rather than the date of the earlier recommendation (on both issues) by a magistrate.

Accordingly, the court finds that interest on the attorney's fees awarded in this case is to run from September 23, 1991, the date on which Chief Judge Henderson found plaintiff to be entitled to attorneys' fees in this matter.

## IV. CONCLUSION

In accordance with the foregoing, it is hereby ORDERED that:

(1) The recommendations of Magistrate Wayne D. Brazil are adopted in their entirety, and plaintiff is hereby awarded $578,011.35 in attorneys' fees and $22,665.46 in costs for work performed up to and including November 4, 1991, for a total of $600,676.81;

(2) Interest on the above fees and costs shall be calculated from September 23, 1991; and

---

**6.** The court also notes that to hold otherwise would create a perverse incentive, where the defendants would be rewarded (through the continued use of funds) for any delay they were able to interpose in the process of determining fees.

**7.** This decision is questionable, as the lower court had applied an interest rate in order to arrive at the present value of the fees, in lieu of awarding present market rates for all work performed. By reversing, the appellate court left the prevailing party completely uncompensated for the delay in payment.

(3) The issue of fees and costs for work on the merits performed after November 4, 1991, and for "fees for fees" work, is reserved for future negotiations and/or proceedings as may be necessary.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATIONS RE ATTORNEYS' FEES

BRAZIL, United States Magistrate Judge.

Chief Judge Henderson referred this matter to the undersigned to make findings and develop recommendations about the amount of attorneys' fees and costs to which plaintiff is entitled as a prevailing party under 42 U.S.C. section 1988.

Plaintiff seeks attorneys' fees totalling $733,074.29 plus a 1.9 enhancer on the portion of these fees that were contingent. Plaintiff also seeks $40,120.22 in costs (exclusive of expert witness fees, to which plaintiff concedes he is not entitled under current law).

Having considered the parties' oral and written submissions, the undersigned submits the RECOMMENDATIONS that follow.

## I. ATTORNEYS' FEES

Title 42 U.S.C. section 1988 provides that, in federal civil rights actions, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." *Hensley v. Eckerhart*, 461 U.S. 424, 426, 103 S.Ct. 1933, 1935, 76 L.Ed.2d 40 (1983). Pursuant to section 1988, a court should award a prevailing plaintiff attorneys' fees "unless special circumstances would render such an award unjust." *Id.* at 429, 103 S.Ct. at 1937. It is not and cannot be disputed that plaintiff in this action is a "prevailing party" under section 1988. Moreover, defen-

dants have not argued that an award of attorneys' fees to plaintiff would be unjust. Instead, defendants vigorously dispute the reasonableness of the amount of fees sought by plaintiff.

A reasonable attorneys' fee is determined by calculating the "lodestar," which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433, 103 S.Ct. at 1939; *United Steelworkers of America v. Phelps Dodge Corp.*, 896 F.2d 403, 406 (9th Cir.1990). Although, in exceptional circumstances, the lodestar may be adjusted by reference to factors outlined in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975),[1] the generally accepted wisdom now is that most (if not all) of the *Kerr* factors are taken into account (either explicitly or implicitly) during the initial calculation of the lodestar. *See Burlington v. Dague*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *Blum v. Stenson*, 465 U.S. 886, 898–900, 104 S.Ct. 1541, 1548–49, 79 L.Ed.2d 891 (1984); *Cunningham v. Los Angeles*, 879 F.2d 481, 487–88 (9th Cir.1988). Thus, in the sections that follow we will focus separately on each of the two components of the lodestar calculation: (1) what hourly rates are reasonable in this case and (2) what hours were reasonably expended on the litigation.

### A. *Reasonable Hourly Rates.*

#### 1. Alan Exelrod.

We focus first upon the reasonableness of the hourly rate sought by attorney Alan Exelrod, who performed the lion's share of the work in this case. Mr. Exelrod requests fees at a rate of $300 per hour, which he claims to be a reasonable 1991 rate for the work he has performed.

At the outset, we note our agreement with applying a 1991 rate. It is true that

---

**1.** These factors are (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Kerr, supra,* 526 F.2d at 70.

plaintiff originally engaged Mr. Exelrod in 1984. (Exelrod decl. para. 14 (11/22/91).) Thus, much of the work performed by Mr. Exelrod was performed at a time when his rate would have been somewhat lower than his 1991 rate. However, we apply the current rate to roughly adjust for inflation so that Mr. Exelrod is compensated for the delay in receiving his payment. *See Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 716, 107 S.Ct. 3078, 3081, 97 L.Ed.2d 585 (1987); *D'Emanuele v. Montgomery Ward & Co., Inc.*, 904 F.2d 1379, 1384 (9th Cir.1990).[2]

" '[R]easonable fees' under section 1988 are to be calculated according to the prevailing market rates in the relevant community." *Blum, supra*, 465 U.S. at 895, 104 S.Ct. at 1547. In demonstrating the reasonableness of a requested rate, "the burden is on the fee applicant to produce satisfactory evidence ... that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.*, at 896, n. 11, 104 S.Ct. at 1547. We thus identify three interlocking elements we must consider in determining the reasonableness of the requested rate: (1) the prevailing rate (2) for similar services (3) by lawyers of reasonably comparable skill, experience, and reputation.

We consider the final element listed above first. The fact that we are required to assess the reasonableness of a requested rate by reference to rates charged by lawyers of *comparable* skill, experience, and reputation undercuts defendants' argument that the rate should be set at the level simply of attorneys of average competence. See pp. 4–5 of defendants' letter brief filed February 11, 1992. In fixing rates courts are to focus on the skill, experience and reputation of the attorneys who *actually*

*litigated* the matter, not on some (probably unknowable) hypothetical "average" attorney. If an attorney representing a civil rights client is among the most skilled and experienced in his profession, then he or she is to be compensated at a rate that prevails for top-notch attorneys of comparable skill and experience rather than attorneys of average competence. To hold otherwise would discourage the better lawyers from representing plaintiffs in civil rights cases, thus jeopardizing the enforcement objectives of § 1988.

Plaintiff has submitted substantial credible evidence that Mr. Exelrod's skills and reputation are of the highest order and are comparable to those of the best civil litigators in the Bay Area. See declarations of Paul A. Renne (filed 2/11/92—para. 5); James C. Sturdevant (filed 1/16/92—para. 11); Alan Carlson (filed 2/11/92—paras. 3–4) ("[I]f I were in need of a plaintiff's attorney myself, Mr. Exelrod would be the first attorney I would call to take my case."); Jonathan H. Sakol (filed 2/11/92—paras. 4–5); Sanford J. Rosen (filed 11/22/91—para. 18); Mark S. Rudy (filed 11/22/91—para. 7); Laura Stevens (filed 11/22/91—para. 11); and Alan B. Exelrod (filed 11/22/91—paras. 2–13). Defendants do not challenge the inferences supported by these declarations; defendants do not argue that Mr. Exelrod is less skillful than the senior civil litigators in this geographic area. Nor do defendants challenge the claim that Mr. Exelrod is very experienced, having been in practice in a range of settings on a full time basis since 1968. Thus, we find that the reasonableness of Mr. Exelrod's requested rate must be measured by reference to the rate prevailing among the most skilled and highly regarded Bay Area attorneys having an experience level comparable to Mr. Exelrod's.

---

**2.** We acknowledge that inflation is not the only factor that would justify Mr. Exelrod's 1991 rate exceeding his 1984 rate. Exelrod's seven years' increased experienced also would justify some increase in his hourly rate. However, given that he has been in practice since 1968 (meaning that the relative change in Exelrod's level of experience during the last seven years is fairly small) we do not attempt to adjust the reason-

ableness of Exelrod's 1991 fee based on the presumptively modest or marginal changes in his experience level over the course of the seven years since 1984. The adjustment we make for inflation is too imprecise to justify an attempt at such fine tuning. But see section 2, *infra*, where we *do* make an adjustment based on the experience factor in the hourly rate sought on behalf of Karen Dutton's work.

We turn next to the "prevailing rate" and "similar services" factors. Because of the arguable (at least partial) interdependence of these factors, it is important to set forth clearly how we are proceeding analytically with respect to these matters. We begin by exploring the meaning of the concept of "similar services." As we make clear in subsequent sections, the concept of "similar services" has more than one dimension, but one of those dimensions is exposed by the observation that, before we can think reliably about what rates are "prevailing," we must ask: prevailing where? And the "where" (within a given geographic area) could be defined variously by subject matter of litigation and/or by the level of complexity and/or magnitude/value of the interests at stake. In other words, by what criteria should we identify the relevant market? What should the 'sphere of reference' be for assessing the reasonableness of Mr. Exelrod's hourly rates? Should it be complex civil litigation generally (in the Bay Area), as plaintiff contends, or, as defendants urge, should it be the sub-world of employment litigation (again, in the Bay area); or should it be civil rights litigation in the Bay area, regardless of the level of complexity involved or the magnitude of the stakes?

We have found no opinion from either the Supreme Court or the Court of Appeals for the Ninth Circuit that squarely addresses this issue or that offers us meaningful guidance about how to approach it. There is an opinion on point from a panel in the Eleventh Circuit: *Perkins v. Mobile Housing Board*, 847 F.2d 735, 737–38 (11th Cir. 1988). That opinion clearly indicates that the two appellate and one district judge who heard the matter believe that the relevant market should consist of representations of "similar clients in similar cases" within the specific geographic area. Expressly rejecting the suggestion that the relevant market consisted of "the total range of fees for all federal civil litigation" within a given geographic area (in that case Mobile, Alabama), the *Perkins* court insisted that the "proper focus" would include "the type of case" or "the type of litigation at bar." *Id.*, at 738. Unfortunately, the *Perkins* opinion offers no reasoning to support or explicate its vigorous pronouncements. It adverts to no legislative history, no social policy, no other cases. Similar limitations accompany the only other opinion from a court of appeals that cuts in the same direction, *Buffington v. Baltimore County*, 913 F.2d 113 (4th Cir.1990) (indicating, at page 130, that the relevant market should be defined by "comparable cases," in that setting "civil rights litigation in the Baltimore community.").[3] Given these limitations, and the fact that we are not bound by cases decided by courts of appeal outside the Ninth Circuit, we elect to approach the matter afresh.

Because the policy implications of how this matter is resolved are substantial, we resort to policy to find our answer. Our thinking starts with our understanding of how the lawmakers have valued civil rights. It is our judgment that the framers of the Constitution and the national legislators who have enacted civil rights statutes have chosen to place civil rights at the very top of our society's value hierarchy. Moreover, our lawmakers have understood that civil rights are peculiarly fragile, that to protect them and give them reality we must institutionalize a constancy of vigilance by making truly useable means of enforcement readily available to many millions of people. Given the great importance of civil rights, and their known fragility, we believe it highly unlikely that Congress, in enacting § 1988, would have intended courts to define the relevant market for determining "similar services" in a way that would reduce the quality or availability of lawyers willing to serve as counsel for persons harmed by offenses to the nation's civil rights norms. Stated differently, we believe that Congress intended the courts to define the relevant market in the way that is likely to contribute the most,

---

**3.** We discuss in a subsequent paragraph of the text the assumption by the *Buffington* panel that there are "rates charged for civil rights litiga- tion" in given geographic areas that can serve as the spheres of reference for fee determinations in civil rights cases.

within sensible bounds, to advancing the goals of the civil rights laws.

We also believe, however, that Congress did not expect courts to approach the task of market definition in ways that would unjustly enrich (create windfalls for) lawyers who represent plaintiffs in civil rights actions. Congress presumably wanted courts to be sensitive to market realities, and to fashion market definitions that would provide reasonable assurance that each potentially meritorious civil rights claim would receive a level/quality of legal service commensurate with (and not appreciably more sophisticated or elaborate than) the needs of that claim. This consideration supports the view that in defining the relevant market courts should pay considerable attention to the level of complexity of the case and to the magnitude of the interests implicated in it. We find unrealistic the implicit suggestion (or assumption) in *Buffington, supra,* that the universe of civil rights cases is monolithic, that all civil rights cases reflect the same level of complexity and implicate interests of the same importance. Rather, from first hand experience on the bench we know that civil rights cases cover a wide range of complexity, some are quite simple, some as dense (conceptually and factually) as virtually any kind of litigation that surfaces in federal court. To ignore that reality would risk either underpaying lawyers who take on complex civil rights actions (thus partially defeating the purpose of § 1988 by reducing the likelihood that plaintiffs in such cases will be able to find lawyers to represent them) or overpaying lawyers who take on simple civil rights cases, creating an unjustifiable windfall.

We believe that the approach to market definition that simultaneously is responsive to this consideration and to Congress' valuation of civil rights generally (as discussed above) focuses primarily on the relative complexity of the case in which fees are sought and looks to hourly rates for cases of roughly comparable complexity across the full spectrum of case types in federal court litigation, not just to the rates associated with civil rights cases or some other sub-world of case type, e.g., employment cases.[4] This approach is superior to a simpler case-type approach based on "civil rights litigation" within the relevant geographic area in at least two respects. First, it contributes more toward advancing the goals of civil rights legislation generally by increasing the likelihood that lawyers will be found to service the truly complex and demanding civil rights cases, the kinds of cases which deliver civil rights benefits to the greatest numbers of people and contribute most to development of the law in this subject area. Second, it reduces the conceptual and evidentiary difficulties created by the fact that for at least some kinds of civil rights cases there is no real "market", meaning that the plaintiffs don't really pay the attorneys, and the attorneys don't really "compete" (at least as that term would be used in a capitalist economic model) to be hired by the plaintiffs. Much of the funding for much of the civil rights litigation comes from public institutions or from defendants against whom judgments are entered. These facts so distort the "economics" of civil rights litigation that it is quite misleading to suggest that there are meaningful market "rates charged for civil rights litigation", as suggested in the *Buffington* opinion. *Id.,* at 130. *See, e.g.,*

**4.** Defendants' argument that the appropriate sub-world for this case should be "employment litigation" is not persuasive. The statute we are trying to interpret, § 1988, covers civil rights cases. It reflects no Congressional concern over, or desire to facilitate, litigation that is not centrally based on civil rights. Employment cases sometimes are based solely on contract law and have no meaningful civil rights dimension at all. Thus the case type "employment litigation" would simultaneously include cases not even arguably reached by § 1988 and exclude a great many civil rights actions (all pre-

sumably the subject of Congress' concern when it enacted § 1988) that arise outside the employment arena. Moreover, if courts were to accept the notion that, for purposes of construing entitlements under § 1988, it is permissible to use some case type criteria other than civil rights, it is not at all clear how courts would go about drawing the case type lines. If "civil rights" were not the case type criterion, to which principles would courts look to determine what those criteria should be? The question is hardly self-answering, which is a reason to greet defendants' suggestion with skepticism.

*Burlington, supra,* —— U.S. at —— – ——, 112 S.Ct. at 2642 (there is no "market treatment" for contingency fee cases).

For all these reasons, we conclude that the appropriate way to identify the relevant market, or sphere of reference, is to begin by assessing the relative complexity of the case at bar, to consider the magnitude of the interests implicated in it, and then to determine what rates generally are paid to civil litigators in federal court in cases of roughly comparable complexity and significance, regardless of case type (meaning that we should look not only to complex civil rights cases, but also to complex cases in other subject areas as well, e.g., securities, intellectual property, commercial contract, antitrust, etc.)

Despite defendants' protestations to the contrary, the case at bar was indisputably complex. It was not fungible with run of the mill employment litigation. While the event sequences were not as dense as in some settings, their details were far from clear (and those details were important). Moreover, probing for evidence of motive or for explanations of the conduct that occurred was quite a subtle undertaking, given the unusual circumstances, the environment of administrative rules and professional relationships, and political barriers. Nor were the damages issues straightforward, as evidenced by the dense motion work in this area and the unorthodox strategies devised by counsel. *See, e.g., infra,* at —— – ——. But the arena where the complexity was arguably the most challenging and important was in the law, especially the law related to the first amendment claims and the immunity defenses. That complexity is clearly evident in the parties' trips to the court of appeals.

Given the complexity of the underlying action, and the level of skill and experience we have found that Mr. Exelrod brought to this matter, the appropriate 'sphere of reference' for conducting the first and most important dimension of our analysis of the "similar services" factor is the hourly rates that the best civil litigators can attract in our community when they are involved in truly complex cases.

Plaintiff has submitted substantial evidence that numerous senior Bay Area attorneys charged rates in 1991 for their services comparable to those sought by Mr. Exelrod here. Arguably most compelling (in part because most obviously disinterested) is the articles from the "California Law Business" section of *The Recorder,* dated January 27, 1992, pp. 15–22, which report that numerous San Francisco firms billed 1991 rates of $300 or more for the work of senior level partners. See Exhibit 1 to the decl. of Samuel Miller filed Feb. 11, 1992. Plaintiff has also submitted orders entered in other cases by both state and federal judges granting senior attorneys 1991 rates comparable to those sought here by Mr. Exelrod. See Plaintiffs' Separate Appendix of Evidence filed 11/22/91, exhibits 1, 2 (using 1990 rates), 5. Finally, plaintiff has submitted numerous declarations supporting his claim that many senior Bay Area attorneys charged 1991 rates comparable to the $300 per hour sought here by Mr. Exelrod. See declarations of Stephen Bomse (filed 2/11/92—para. 6); James C. Sturdevant (filed 1/16/92—para. 7–9); Fred Altshuler (filed 1/16/92—paras. 5–7); Jack Knebel (filed 1/16/92—para. 5); Sanford J. Rosen (filed 11/22/91—paras. 33–34); Guy Saperstein (filed 11/22/91—paras. 6–8); Warren E. George (filed 11/22/91—paras. 4–6); Mark S. Rudy (filed 11/22/91—paras. 15–16); Laura Stevens (filed 11/22/91—paras. 21–23).

Defendants' counter-submissions focus for the most part (but not exclusively)[5] on rates charged within the employment litigation sub-world.[6] While not wholly irrelevant, evidence that is confined to that sub-world is of limited value and fails to controvert the evidence adduced by plaintiffs about rates charged in other parts of the complex civil litigation market. Having

---

5. See, e.g., the declarations of Terrence P. McMahon and Neil O'Donnell, filed January 6, 1992, both of which offer evidence about market rates beyond employment litigation.

6. See, e.g., declarations of Alan R. Berkowitz and John C. Fox, filed January 6, 1992, both of which offer evidence about rates in employment litigation.

considered all of the evidence presented by both sides, we find that plaintiffs have proven, by at least a preponderance of the evidence, that a rate of $300 (and even $330) is indeed prevailing for high-level, senior partners in Bay Area firms who have been in practice 20 years or more.

At this juncture we turn to another dimension of the concept of "similar services" as that phrase is used in fee litigation under § 1988. The kind of comparison suggested by this phrase requires, as a necessary first step, a careful examination of the specific character of the services for which compensation is being sought. Courts must be sure that there is nothing unusual, i.e., out of sync with the norm in the market to which comparison is invited, before concluding that "similar services" have in fact been rendered. We must be sure, in short, that we compare apples to apples. It is in this respect that Mr. Exelrod's submissions fall short.

Plaintiff has provided no direct evidence that a *solo practitioner* performing the bulk of the work on a complex case *himself* could survive in the Bay Area market charging an hourly rate of $300. Plaintiff has provided no declaration from a solo practitioner stating that he or she charges that much for all work performed on a case. Those attorneys who have submitted declarations stating that they charge rates comparable to $300 per hour (i.e. Mr. Sturdevant, Mr. Altshuler, Mr. Knebel, Mr. Saperstein, Mr. George, Mr. Rudy, and, of course, Mr. Rosen) all are partners in firms and, presumably, do not regularly perform basic, detail level legal work. It is one thing for a partner in a firm to charge a premium rate for putting in a relatively limited number of well focused hours, serving largely as a director for and supervisor of junior partners or associates who do most of the work and whose time is billed at appreciably lower hourly rates. It is quite another thing for a solo practitioner to charge a premium rate for doing by himself much of the "legwork," e.g., reviewing documents and transcripts, taking routine depositions, doing factual or legal research, drafting written discovery and responses to discovery requests from opponents, etc.

A partner in a firm can survive in the marketplace charging a premium because the client is paying the premium rate for only a relatively small percentage of the total hours for which he is being charged. For example, in the order filed October 2, 1991 in the case *Toussaint v. Gomez*, No. C–73–1422 SAW (JSB) (attached as Exhibit 1 to Plaintiff's Appendix of Evidence filed 11/22/91) ("the *Toussaint* order"), although Mr. Rosen was awarded $330 an hour for the 83 hours he worked on the case, the average rate for all the attorneys in his firm was $198 per hour (for a total of 402.1 hours), and the total average rate for all the attorneys whose hours were reflected in the order was $210.70. Likewise, in the order filed on November 1, 1991 in the state case of *Estes v. McCarthy*, (Marin Superior Court No. 127247) (attached as Exhibit 5 to Plaintiff's Appendix) ("the *Estes* order"), the total average rate awarded was $173, despite individual rates of $330 for Mr. Rosen and $305 for Mr. Schlosser.

Absent clear proof to the contrary (which plaintiff has not provided), we must infer that fee paying clients simply would not tolerate being charged a premium rate for work done by a senior lawyer that could be done on a much more cost-effective basis by less senior and less pricey counsel. Although it is true, as plaintiff argues, that there will be some time saving by having the more experienced attorney do all the work himself, this factor is not sufficient to overcome the obvious inefficiencies that accompany an approach in which a very highly paid lawyer does all the detail work. There is only so much time that can be shaved from the defending of a deposition. And a senior litigator cannot read reams of documents, e.g., in a privilege screening, or even in a search for relevant material, a whole lot faster than a junior partner. More to the legal point, Mr. Exelrod had failed to carry his burden of proving that the substantially higher rate he seeks can be justified by a compensating substantial reduction in the number of hours spent on the case.

From the evidence we have been presented it appears that Mr. Exelrod performed most of the work in this case himself. He is requesting compensation for 2,265.62 hours. Exhibit 1 to plaintiff's Reply, filed 1/16/92. By contrast, Karen Dutton is seeking compensation for only 378.25 hours, the vast majority of which she spent on motion work during a six-month period in 1987. *Id.*, exhibit C to decl. of Exelrod file 11/22/91. The Rosen firm claims only 66.4 hours. Exhibit 1 to Reply. And while it appears that plaintiff himself committed substantial time to the case, Exelrod decl. I, para. 27, we have no evidentiary basis for determining how much time, relative to Mr. Exelrod's, plaintiff contributed to the core lawyering work. Nor is it clear what efforts were taken to coordinate or integrate the work by plaintiff and his lawyer. Knowing little about the number of hours plaintiff spent on the case, and considering the very large proportion of the *recorded* time that Mr. Exelrod claims, we feel constrained to infer that a fair portion of the time for which Mr. Exelrod seeks a premium rate was spent doing work that, at least in a firm environment, would have been performed by an associate for a substantially lower rate.

Because an award of attorneys' fees under Section 1988 must be based on prevailing *market* rates, and because plaintiff has failed to demonstrate that the market could bear a rate of $300 per hour for most of the work performed on one complex case, we must reject Mr. Exelrod's requested rate as not being reasonable.

Having decided that the rate requested by Mr. Exelrod is not reasonable, we are left with the task of fixing an appropriate hourly figure. There is no caliper to point us to the precisely correct number. Rather, we consider the various round numbers (e.g., $200, $225, $250, $275) that the evidence suggests might be appropriate and select the figure that seems the most reasonable given all the circumstances. For a variety of reasons, we recommend that the district court fix Mr. Exelrod's rate at $250 per hour.

One way to get some leverage on this issue is to consider the average hourly rate for all the lawyering work done on similar cases. As we noted above, attorneys were awarded an average 1991 rate of $210 per hour in the *Toussaint* order. See *Toussaint* order, pp. 2–4. In the *Estes* order an average rate of $173 was awarded. Senior attorneys in both cases were awarded premium fees of $300 or more (which, as we found above, is a rate to which Mr. Exelrod is entitled for the more sophisticated work he has had to do on this case). The average awards in those cases provide a floor beneath which it clearly would not be appropriate to go with respect to Mr. Exelrod's time. The more difficult question is how far above those averages is appropriate. Given the indisputably high quality of Mr. Exelrod's lawyering skills, the depth of his experience, the excellence of the results he achieved on behalf of his client, and the fact that Mr. Finkelstein's efforts relieved Mr. Exelrod of having to perform some of the basic, detail legal work that was involved in this case, we recommend that the district court fix Mr. Exelrod's hourly rate at $250.

A couple of additional considerations support this recommendation. First, Mr. Exelrod actually charged clients $250 per hour in 1991 for basic consultation services. See Exelrod decl. (11/22/91) at para. 39. Although actual rates charged by attorneys are not dispositive in section 1988 fee litigation, they can be considered as evidence. *Maldonado v. Lehman*, 811 F.2d 1341, 1342 (9th Cir.1987), *cert. denied*, 484 U.S. 990, 108 S.Ct. 480, 98 L.Ed.2d 509 (1987). The fact that Mr. Exelrod charged this rate in 1991 is some evidence that his own valuation of his legal services is in line with the court's figure.

Finally, the rate we choose is within the range (albeit at the high end) suggested by defendants. Although defendants argue that the rate should be in the middle of their proposed range of $200 to $250, they do so in part on the ground that plaintiff is only entitled to a rate that is sufficient to attract counsel of average competence, an argument we already have rejected.

To repeat, then, we recommend that Mr. Exelrod be compensated at the rate of $250 for the work he has performed on this case.

### 2. Karen Dutton.

■ Plaintiff requests that Ms. Dutton be awarded fees at a rate of $150 per hour for the work she performed on this case in 1987. Defendants challenge this request, contending that at the time Ms. Dutton performed the work she was a first year associate and that $150 is an excessive 1991 rate for work done by an attorney as a first year associate. Plaintiff counters that $150 is more than reasonable because it is lower than Ms. Dutton's current (1991) actual rate of $180.

Defendants clearly have the better of this argument. Again, the reason for granting fee awards at present rates for work done years in the past is to compensate for the delay in receiving payment. As defendants point out, however, a court may "refuse to use current hourly rates on the grounds that increased rates reflect the attorney's increased knowledge and experience, not merely inflation." *Burgess v. Premier Corp.*, 727 F.2d 826, 841 (9th Cir. 1984). At the time Ms. Dutton performed her work, she was a first year associate. Thus, even taking inflation into account, she should be awarded no more than a reasonable 1991 rate for a first year associate. In his fee request, plaintiff seeks 1991 rates of $110 for Katherine Sher and $100 for Stephen Liacouras, both of whom were first year associates in 1991. We accept these requests as evidence of a fair 1991 rate for a first year associate.

We thus recommend that the district court fix the rate for Ms. Dutton's work on this case at $110 per hour.

### 3. Attorneys from Rosen, Bien & Asaro.

We recommend that the district court award Sanford Rosen, Andrea Asaro, Katherine Sher, and Stephen Liacouras their full requested rates.

Mr. Rosen has been awarded fees in other cases at the $330 per hour figure he seeks here. See *Toussaint* order; *Estes* order. Unlike Mr. Exelrod, Mr. Rosen is not seeking this premium rate for work typically left to associates. He seeks compensation for only 9.2 of the 66.4 hours spent by his firm on the case. A review of the time runs attached as Exhibit 7 to Mr. Rosen's 11/22/91 declaration indicates that he committed most of his time to supervising and reviewing the work of the other lawyers in his office and to coordinating their efforts with Mr. Exelrod's.

The $235 per hour rate requested for Ms. Asaro is within the range for younger partners in well-regarded firms. See Exhibit 1 to the Declaration of Samuel R. Miller, filed February 11, 1992. Ms. Asaro's resume reflects a very high level of educational achievement, as well as significant experience in a demanding commercial firm. Compensating her at a rate appropriate for a young partner working on challenging commercial litigation is reasonable, especially since she devoted most of her time to working on the opposition to defendants' petition for certiorari before the United States Supreme Court.

Defendants do not challenge the rates requested for the work of Ms. Sher and Mr. Liacouras.

### B. *Compensable time.*

We now focus on the other component of the lodestar analysis: how much of the time devoted to this litigation by plaintiff's attorneys is compensable? In Exhibit 3 to the declaration of Martin H. Dodd (filed 1/6/92), Mr. Dodd specifically identifies numerous hours defendants contend should be excluded from the lodestar for various reasons. In the following sections, we take up each specific category of hours challenged by defendants. In addressing these categories, we bear in mind that plaintiff already has made an across-the-board 5% billing judgment reduction to account for any minor errors counsel may have made in billing.

### 1. Hours spent on claims against Bergna and the County on which plaintiff did not prevail.

Defendants argue that many of the hours for which plaintiff's counsel seeks

compensation were spent on claims or damage theories on which plaintiff ultimately did not prevail. There are basically two categories of hours that defendants challenge in this respect: (i) hours spent on claims and damage theories against defendants Bergna and the County which did not bear fruit, and (ii) hours spent on claims against defendants other than Bergna or the County. We address the first of these categories in this section.

We note at the outset that the law vests the district court with substantial discretion in determining the reasonableness of the number of hours spent on the litigation. *Corder v. Gates*, 947 F.2d 374, 377 (9th Cir.1991); *see also, Hensley, supra*, 461 U.S. at 437, 103 S.Ct. at 1941.

As noted earlier, section 1988 authorizes the court to award reasonable attorneys' fees to plaintiffs who prevail in civil rights litigation. The Supreme Court held in *Hensley, supra*, 461 U.S. at 434–35, 103 S.Ct. at 1939–40, that courts generally should not award attorneys' fees incurred on claims upon which the plaintiff did not prevail and which were "unrelated" to claims upon which the plaintiff *did* prevail. In elaborating on the meaning of the term "unrelated," the Court stated that, where a plaintiff presents in one lawsuit "distinctly different claims for relief that are based on *different facts and legal theories,* ... work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate relief achieved.' " *Id.* (emphasis added); quoting *Davis v. Los Angeles*, 8 E.P.D. ¶ 9444, 1974 WL 180 (C.D.Cal. 1974). In such a case, plaintiff should not be awarded fees incurred on the unsuccessful claim.

The Court has made it very clear, however, that there are circumstances in which a plaintiff may be awarded fees for time reasonably spent on some claims or lines of case development on which plaintiff ultimately did not prevail. In *Hensley*, for example, the court noted that often a plaintiff will present numerous claims for relief that are not unrelated but that "involve a common core of facts or [that are] based on related legal theories." *Id.* 461 U.S. at 435,

103 S.Ct. at 1940. In such a case, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*

*Hensley* and other cases interpreting § 1988 inform our understanding that courts are to consider the following factors when they decide whether counsel for plaintiff should be compensated for hours spent on "claims" that did not directly yield relief: (1) the relative reasonableness of pursuing the kinds of claims on which no relief was secured (this is an inquiry, vaguely akin to the kind currently undertaken under Rule 11 of the Federal Rules of Civil Procedure, into the reasonableness of counsel believing, at the various junctures he pressed forward with a particular cause of action, that it held a sufficient promise of viability, both legally and factually), (2) the relationship in legal theory between the claims on which plaintiff obviously "prevailed" and the claims on which he did not formally recover, (3) the relationship in factual underpinnings between the two kinds of claims, (4) the relative fullness of the damages and/or other kinds of relief plaintiff achieved (i.e., how much of the relief he sought under all of his theories did he end up achieving), and (5) the relationship between the magnitude and/or significance of the relief plaintiff actually achieved and the size of the legal bill his counsel generated in obtaining that relief.

We also read the law under § 1988 as acknowledging, within reasonable boundaries, certain fundamental facts of litigation life in our adversary system and in our legally complex society. Courts like *Hensley* recognize that it is not only common but in many cases necessary for counsel to plead several different claims or "causes of action" arising out of one integrated set of facts or one interconnected series of events. Counsel who do not plead all theo-

retically available legal theories are subject to after the fact criticism by their clients, even malpractice actions. More important, at the time they file their complaints counsel often (understandably) cannot foresee exactly what evidence the discovery process will turn up and how the evidence, as it evolves, will "play" against what is sometimes a mobile and conceptually dense legal landscape, especially in civil rights law, where courts and legislatures "move" the law regularly, sometimes in unpredictable directions. As noted by the Ninth Circuit:

> Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war. Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning. *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1053 (9th Cir.1991).

Given these realities, courts would frustrate the purposes of § 1988 if they created an environment in which lawyers seeking to protect fundamental civil rights were actively discouraged from pleading alternative and conjunctive legal theories by the spectre of judges, after the fact, penalizing counsel economically because some of the theories they pled did not result in relief.[7] Creating such an environment would force civil rights attorneys to be much more con-servative in attempting to articulate different legal bases for relief than are other attorneys, thus diluting enforcement of our civil rights laws and retarding evolution of legal doctrine.

Given the courts' general acknowledgement of these facts of litigation life, we read the case law as indicating that while all of the five factors listed above have roles to play, at least in some settings the first, third, and fourth may be weightier than the other two. We are reinforced in this inference in part by the fact that no court seems to have explicated in a comprehensive way the meaning of the second factor, and, without such an explication, we are unsure how to think reliably about whether given legal theories are "related." In addition, we note that there is at least some authority for the proposition that fees may be deemed "reasonable" even if they are way out of proportion to the economic value of the relief achieved,[8] suggesting that, at least in some settings, the fifth factor also may not loom as large as some of the others.

With these general principles as our guide we turn to the case at bar. Plaintiff's counsel pursued relief against the County and Bergna on several different legal bases. We have concluded, in part for reasons elaborated below, that at the outset of a case like this one, where the factual setting was complex and unclear,

---

7. There is some language in some Ninth Circuit cases which, if read in a vacuum, could be interpreted as supporting a more stringent standard. For example, one panel stated that

> the relief obtained justifies a lower fee if plaintiffs fail to obtain relief on all claims, and if hours spent on unsuccessful claims were not needed to pursue successful claims. *Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir.1988).

*See also, Romberg v. Nichols*, 953 F.2d 1152, 1164, n. 8 (9th Cir.1992) (The court need not "compensate the attorney for efforts expended on extraneous and dismissed claims that did not contribute to the victory. The proper focus is upon time expended on efforts that ultimately proved successful.") Under such language, it might be argued that, even when all the claims are based on the same facts, the court should exclude hours spent at least on the legal (as opposed to factual) merits of the unsuccessful claims that in no way contributed to plaintiff's ultimate success on the successful claims. However, these statements that would support such reasoning are dicta which we take to be applicable only where the different claims are truly "unrelated" as that term was used by the Supreme Court in *Hensley*. Defendants have cited and our research has turned up no case in which the plaintiff obtained fulsome relief but the court nonetheless did not award plaintiff's counsel compensation for hours spent on related claims on which plaintiff did not succeed. In both cases cited by defendants, the court decreased the attorneys' fee awards expressly because of the plaintiff's *limited* success. *Corder v. Gates*, 947 F.2d 374 (9th Cir.1991), *Cunningham v. County of Los Angeles*, 879 F.2d 481 (9th Cir.1988).

8. *City of Riverside v. Rivera*, 477 U.S. 561, 574–78, 106 S.Ct. 2686, 2694–96, 91 L.Ed.2d 466 (1986) (plurality opinion).

where the conduct and status of some of the defendants was quite unusual, where some of the relevant law was by no means clearly established,[9] where the stakes (political, personal, and economic) were high, and where it was arguable that issues of principle of the first order of magnitude in a democratic society were implicated, it was in no sense unreasonable for plaintiff's lawyer to plead several different federal and state law theories arising out of the same common core of facts.

The legal theories pressed on plaintiff's behalf essentially fell into five categories: violation of due process rights, violation of free speech rights (arising both under the Constitution and under state and local law), defamation, invasion of privacy, and conflict of interest. In the paragraphs that follow we consider briefly each of the kinds of claims which formally yielded no relief in this litigation.

i) The First Amendment claim against *Bergna* was dismissed on a legal ground (qualified immunity) so complex that the Ninth Circuit had to consider the issues implicated here twice before ultimately dismissing this claim. Given the obviousness of the fact that defendant's conduct implicated First Amendment values, the importance to plaintiff of interests invaded by that conduct, and the conceptual density of the legal ground on which the claim ultimately was terminated, it clearly was not unreasonable for plaintiff to pursue relief on this legal theory.

ii) A much stronger argument can be made against the reasonableness of pursuing the First Amendment claim against the *county* in plaintiff's second amended complaint (filed April 17, 1987), after Judge Henderson had granted the county's motion for summary judgment on that claim almost a year earlier. See order filed June 23, 1986. While counsel for plaintiff argued in opposition to the county's subsequent motion to dismiss that new facts had come to light that the court had not been in a position to consid-

er in ruling on the earlier motion for summary judgment, Judge Henderson obviously found this line of argument unpersuasive. See opposition filed May 18, 1987; order filed July 17, 1987. If the objective reasonableness of repleading this claim against the county were the only factor in our analysis, we would conclude that counsel for plaintiff should not be reimbursed for time devoted only to this claim after the initial entry of summary judgment on it, even though this claim was closely related both legally and factually to other claims that it clearly was reasonable for plaintiff's counsel to continue pursuing. But the reasonableness of pursuing this claim, viewed in isolation, is not the only factor in our analysis. There are four others, and, for reasons detailed below, the full analysis called for by the case law supports the conclusion that the hours invested in this claim are compensable.

Our conviction that this is the appropriate disposition of this aspect of this fee dispute is increased by the relatively small number of hours involved here. The only appreciable time devoted solely to this claim after the June 23 entry of summary judgment was spent opposing the County's 12(b)(6) motion. Of the 38 pages of opposition brief that plaintiff filed on May 18, 1987, only 3.5 (i.e., 9%) were spent arguing the First Amendment issue against the county. We thus *roughly* estimate that 9% of plaintiff's work on the 12(b)(6) opposition was spent on this issue. Mr. Exelrod spent a total of 15.9 hours on the opposition, 9% of which is 1.43 hours. Karen Dutton spent 77.35 hours on the opposition, 9% of which is 6.96 hours. Thus, the total hours excludable on this issue would be about 8.4, which we find small enough to be subsumed under plaintiff's across-the-board 5% billing judgment reduction.

iii) The state and local law analogues to this First Amendment claim were not dismissed until 1991 on the grounds of

9. For example, the Ninth Circuit twice considered defendant Bergna's claim that he was entitled to qualified immunity on the due process and First Amendment issues, reversing itself the

second time on the latter issue. *Finkelstein v. Bergna*, 881 F.2d 702 (9th Cir.1989), *opinion withdrawn and redecided,* 924 F.2d 1449 (9th Cir.1991).

exhaustion of administrative remedies. See order filed Feb. 12, 1991. If these claims were so obviously meritless for this reason,. we suspect that the County would have realized that and filed its motion to dismiss on that ground much sooner.

iv) We certainly cannot conclude that it was unreasonable for plaintiff to assert the defamation claim in his initial complaint. Judge Henderson dismissed that claim some three years later on the ground that plaintiff had been unable to develop significant evidence that supported the inference that Bergna actually knew (or had strong reason to suspect) at the time he held the fateful press conference that his statements about plaintiff were false. The district court ruled that without such evidence plaintiff would not be able to prove the "actual malice" required in these circumstances. See order filed June 23, 1986. Given the relationship between Bergna and plaintiff's opponent in the election, and the timing of the press conference, however, it was well within the bounds of reason for counsel for plaintiff to believe, at the time the complaint was filed and for a considerable period thereafter, that discovery would turn up evidence of actual malice. It is of some moment in this regard that, in the end, plaintiff was able to convince the jury that Bergna's behavior warranted a very large punitive damage award.

v) The invasion of privacy claim appears to have been based on fairly novel legal theories interpreting California's relatively new constitutional provision protecting its citizens' privacy. See plaintiff's briefs filed May 18, 1987 and November 20, 1989. Although Judge Henderson eventually rejected plaintiff's arguments and disposed of this claim on grounds paralleling his disposition of the defamation claim, we cannot say that it was unreasonable to pursue this theory. It certainly was not frivolous to suggest that defendant's conduct implicated interests that this new constitutional provision was intended to reach. And since there was so little law interpreting this

provision, it was appropriate for plaintiff's counsel to conclude that there was some meaningful possibility that the trial court would frame a cause of action under this new law that plaintiffs could generate sufficient evidence to support.

vi) For somewhat similar reasons, we reject the suggestion that it was unreasonable for plaintiff to pursue a claim based on Bergna's alleged conflict of interest. The facts of this case were extraordinary, in some ways unprecedented. This was not, as defendants would have us believe, little more than a "run of the mill" wrongful termination action (whatever that disrespectful phrase implies). Given the unusual aspects of both the alleged conduct and the status of the major players in the drama that gave rise to the lawsuit, it was reasonable for counsel for plaintiff to plead and pursue some novel legal theories. The fact that no court had ruled that the rules of professional conduct relating to conflicts of interest could be the source of a cause of action by a party who had not enjoyed an attorney-client relationship with the defendant did not, by itself, make it unreasonable to plead this claim. Rather, the fact that there was little law clearly on point, in combination with the unusual character of the facts giving rise to this litigation, made it not unreasonable to conclude that the courts might use this case as a vehicle for extending the law into new territory in this subject area.

Moreover, it does not appear that plaintiff spent much time on this action. Plaintiff committed only two pages of briefing to opposing the motion to dismiss this claim (see plaintiff's brief of May 18, 1987). This minimal time would be subsumed within the 5% billing judgment.

Turning to the second factor in our analysis, we are not sure how to go about assessing, for purposes of fixing fees under § 1988, the nature or extent of the relationship in *law* (legal theory) between the kinds of claims on which plaintiff prevailed, on the one hand, and, on the other, those which directly yielded no relief. The

due process and first amendment claims are legally related in that they share a common legal source, i.e., the Constitution. We honestly are not sure why that should be a factor of any moment in this analysis. It also is arguable (but not apparently significant) that the due process and the conflict of interest claims have something legally in common: at one level of allegation, the conflict of interest made providing plaintiff with the process to which he was due inherently impossible. There also seems to be some legal relation between the defamation and the invasion of privacy claims in that there is at least some overlap between the interests those two legal theories were intended to protect. Why "relationships" like these should matter much in this setting, however, is not clear. What the appellate courts seem to want trial courts to focus on is not abstract or conceptual linkages in legal theory, but the extent of the real world integration of the underlying litigation: did it approximate a seamless web, so that it would be essentially impossible to unravel the work that interconnected its elements and basically unfair to treat components of it as having meaningful separate existences, or did it more closely approximate "a series of discrete claims" which might have been presented quite viably as separate lawsuits. In attempting to answer this question, given that we live in a legal world that has sanctioned the proliferation (through statutes and the common law) of legal theories, that acknowledges that the same conduct or events often can give rise to relief on many different legal bases, and in which what the facts turn out to be generally is regarded as much more important than what legal labels are attached to them, we believe that courts should focus primarily on the *factual/evidentiary* interdependence of the plaintiff's claims.

In the case at bar, each of the five categories of claims that plaintiff pressed against the County and Bergna arose out of one densely interconnected set of events. If we focus on facts and evidence, we feel no reluctance at all to conclude that this litigation represented a seamless web. It was essential to undertake basically the same factual inquiry in order to develop each of the five categories of claims. None of those claims could have had real viability without discovering and exposing in detail what defendants did, in what sequence, when, why, and what real world effects those actions had on plaintiff. It follows that this most important of factors cuts strongly in favor of a finding that counsel for plaintiff is entitled to reasonable compensation for time spent on all of the claims pressed against the County and Bergna.

The third factor, which also is important, cuts similarly in favor of the same finding. A jury awarded plaintiff $1,175,000 in damages, despite the fact that he suffered only a few thousand dollars in lost wages. Significantly, that award was greater than any of plaintiff's settlement demands.[10] Moreover, plaintiff achieved the core vindication of the fundamental rights that had inspired his suit: the court found as a matter of law that the County and Bergna had in fact violated plaintiff's rights under the due process clause of the Constitution and the jury concluded that Bergna's conduct was so egregious that it warranted an award of punitive damages in the sum of $500,000. In a post-judgment settlement, plaintiff also secured a commitment from the County to expunge suspensions from his personnel records. See Notice of Settlement Agreement filed April 30, 1992; Exelrod decl. # 2, para. 6; Dodd decl., para. 37. By any fair measure, these results show that the overall relief obtained by plaintiff was significant and fulsome. One telling indicator of its fulsomeness is the margin by which it exceeded the defendants' *final* settlement offer (made after years of litigation), an offer made after their liability had been established and the only issues to be tried related to damages. In that setting, defendants offered plaintiff some $300,000 (not counting attorneys' fees). See Exelrod

---

**10.** Plaintiff's settlement demands of $1.1 million and $1.2 million included attorney's fees. Ravel

decl. (filed 1/6/92) at paras. 11–13.

decl. #1 at para. 36. Since plaintiff's award from the jury almost quadrupled that figure, defendants' efforts to belittle plaintiff's achievement at trial have something of a hollow ring. Nor is plaintiff's achievement diminished in any meaningful way by the fact that plaintiff's complaint formally prayed for larger damages or that counsel asked the jury during the trial to return a verdict that would include appreciably larger sums for injury to plaintiff's reputation and for emotional distress. It is well known that counsel inflate damages numbers in such settings, in part to cover for future developments (unknowable at the pleadings stage) and in part to compensate in the jury's deliberations for the predictably substantial deflation of the value of the case that defense counsel will offer. As the Court affirmed in *Hensley*, a "court's rejection of ... certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Hensley, supra*, 461 U.S. at 435, 103 S.Ct. at 1940. In the case at bar, the result that matters was a remarkably fulsome victory.

The final factor we consider, less important than the two most immediately preceding, is the relationship between the magnitude and/or significance of the relief obtained and the size of the legal bill generated in pursuit of that relief. This factor has emerged as a result of courts having felt concern about cases where the legal bills appear totally out of proportion to the value of the results. There have been cases where the fees sought have exceeded by large multipliers the damages awarded. Of course, it can be quite inconsistent with the spirit of the civil rights laws generally, and with the legislative history of § 1988 in particular, to focus in these analyses only on the *monetary* value of relief. See *Riverside, supra*, 477 U.S. at 574–78, 106 S.Ct. at 2694–96 (plurality). Where an important constitutional or statutory right has been vindicated, or an important civil rights norm has been infused with new visibility or meaning, it can be entirely appropriate to award fees that exceed by a large margin the monetary value to the plaintiff of a judgment.

We need not rely on such value-laden reasoning, however, in the case at bar. Even if we confine our focus to money we find no uncomfortable distortion in the relationship between the amount recovered by plaintiff and the size of the fee being sought from the County and Bergna. As noted above, the jury awarded plaintiff $1,175,000 in damages.[11] The attorneys' fees and costs sought by plaintiff's counsel amount to just under $775,000; we have reduced these (for reasons set forth both *supra* and *infra*) to $600,676.81. Thus the monetary value of the case to plaintiff exceeds by several hundred thousand dollars the price tag of delivering that value. Given that the litigation spanned some eight years, and involved multiple trips to the court of appeals, this is not a relationship between ends and means that unnerves the court. Moreover, we must emphasize that the results achieved by counsel for plaintiff included some most significant non-economic components: plaintiff's fundamental constitutional rights to due process were vindicated, his name was publicly cleared, the disciplinary actions were removed from his personnel file, and he experienced the satisfaction of a resounding jury condemnation of the man whose actions caused him so much difficulty. These intangible achievements deserve considerable weight in assessing the relationship between the overall results of the litigation and the size of counsel's fees, a relationship that we hereby find to be well within the bounds of reasonableness. It bears mentioning, in this regard, that plaintiff's first attorney, Harold McElhinny, appeared to make an offer of settlement very early in the life of this dispute that would have ended it at no cost to these defendants. See letter dated 12/29/82 attached as ex. 1 to Exelrod decl. #2 ("This injury cannot be cured by anything less than complete exoneration and an offer of reemployment. If the County is prepared to meet those demands I believe the dispute can be resolved.")

---

**11.** After the defendants appealed the jury verdict, the plaintiffs settled for $1,050,000.

Without undertaking the kind of analysis set out in the preceding paragraphs, defendants generally assert that plaintiff "over-litigated and over-complicated [this case] with nonmeritorious claims and theories." Defendants' Opposition at 11. In support of this argument, defendants assert that they "have identified 649.57 hours, or roughly 25–30% of the Exelrod firm's total time, which was incurred in asserting, and thereafter unsuccessfully litigating these many meritless and duplicative claims." *Id.* This identification is set out in a pair of multi-page charts included in Exhibit 3 to the Dodd declaration (pp. 3–6 and 13–14). We have carefully examined these charts and find defendants' assertion to be a considerable overstatement. Most of the hours identified by defendants involved plaintiff's opposition to seven different motions (plus the Ninth Circuit appeal and subsequent petition for rehearing) filed by defendants. With the exception of a summary judgment motion filed by the County in mid–1987 and the 12(b)(6) motion filed in April of 1987, every motion required plaintiff to do a substantial amount of work on the due process claims upon which he ultimately prevailed. Significantly, more than 100 of the hours challenged by defendants in these charts reflect work done by counsel for plaintiff in opposing defendants' Ninth Circuit appeal and subsequent petition for rehearing. The main issue in that appeal was whether Bergna had qualified immunity from the due process claims.[12] We are at a loss to understand how defendants can state that the entire 650 hours they challenge were devoted to "asserting ... these many meritless and duplicative claims" when it is clear that a substantial percentage of that time was directly spent on the due process claims upon which plaintiff ultimately prevailed.

In sum, having considered carefully defendants' arguments and evidentiary submissions, and having completed our analysis of all five of the factors we think the case law makes relevant, we conclude that plaintiff's fee request should *not* be reduced (more than the 5% already subtracted by counsel) to compensate for time committed to pursuit of claims against Bergna or the County that did not directly bear fruit.

In addition to challenging plaintiff's request for fees related to claims on which no relief was secured, defendants contend that deductions should be made for the time plaintiff's counsel spent with experts developing certain measures of damages that the court ultimately rejected. Specifically, the court rejected plaintiff's attempt to introduce (a) the actual salary of a District Attorney as evidence of what plaintiff might have made in the private sector (plaintiff conceded he could not introduce as damages what plaintiff would have earned had he been elected) and (b) the cost of trying to "repair" plaintiff's damaged reputation directly by purchasing "corrective" media space. See Order filed 2/12/91 at 6–13. While the district court's rulings on these proffers speak for themselves, it is not clear to us that it was beyond the pale of reasonableness for plaintiff to suggest these admittedly adventurous approaches to measuring damages. We must bear in mind that plaintiff arguably suffered harm to unusual interests: he was a professional prosecutor and a candidate for public office at the time defendants engaged in the conduct that infringed his rights under the Constitution and presumptively caused him injury. There aren't lots of precedents for this situation; the hornbooks don't lay out simple formula for assessing the value of the harm plaintiff suffered. Moreover, even though plaintiff's experts Moss and Solem were not allowed to testify on these matters, they were allowed to testify in related areas: Moss *did* testify as to plaintiff's loss of earning power and Solem *did* testify about the effect of the adverse publicity on plaintiff's loss of reputation. See Exelrod decl. # 2 at paras.

---

12. Only 13½ pages of plaintiff's 46–page appellate brief and less than 1½ pages of plaintiff's 12–page opposition to the petition for rehearing dealt solely with First Amendment and state law issues. The due process issues were a driving force behind the appeal, as was evidenced by defendants taking that issue to the Supreme Court even after winning in the Ninth Circuit on the First Amendment issue.

21, 25. Considering that plaintiff was awarded substantial damages for both loss of earning potential and damage to reputation, we find that plaintiff's counsel should be fully compensated for his undeniably successful work with these experts—it was only one aspect of each of their testimony that was excluded (despite defendants' argument in their motion for a much broader exclusion at least on the damage to reputation issue—see their reply filed 11/27/89 at 4–9). The only hours we would even consider excluding for plaintiff's pursuit of the rejected damage theories would be work done on the unsuccessful portions of the November 5, 1990 opposition to defendants' motion. Mr. Exelrod spent 62.8 hours on this 23 page opposition, only 3.5 pages of which (5:9–21, 12:24–13:15, 14:16–16:19) dealt exclusively with the damage issues upon which plaintiff lost (there were numerous other very related damages issues upon which plaintiff prevailed). Thus we estimate, roughly, that 15% of the work, or 9.42 hours, was spent on this unsuccessful matter. Given plaintiff's across-the-board billing reduction of 5%, any excess that might remain is *de minimis.*

For all the reasons set forth above we recommend that the district court make no reduction in the fee request based on plaintiff's pursuit of unsuccessful claims against or bases for damages from Bergna or the County.

2. Hours spent on claims and issues involving defendants against whom plaintiff did not prevail.

In addition to Bergna and the County ("the county defendants"), plaintiff sued several media defendants who were dismissed in 1985. Bergna and the County challenge Mr. Exelrod's claim to entitlement for fees arising out of work done in connection with these other defendants. Defendants' Opposition at 8. Plaintiff counters that Mr. Exelrod already has redacted time entries related to the dismissed defendants and that the hours specifically challenged by defendants were spent pursuing plaintiff's claims against Bergna and the County.

We conclude (and plaintiff apparently concedes) that it is not reasonable to make the county defendants pay for hours spent by plaintiff's counsel in his unsuccessful claims against the media defendants. We also find that most of the hours identified by defendants in this section should be excluded. The hours defendants challenge here are too numerous to be subsumed fairly within the general 5% downward billing judgment already made by counsel for plaintiff. We take these hours up item by item.

Defendants challenge a half hour spent on 9/11/84 researching the journalist's privilege. We agree with plaintiff that this small amount of research is allowable even against the county defendants, given the numerous potential journalist witnesses in this case. See Exelrod decl. # 2 (filed 1/16/92), para. 13.

Defendants challenge one hour spent on 10/1/84 opposing a motion to dismiss Terri Briggs, who was named as a party but never served. Despite the fact that she may have been a crucial witness (see Exelrod decl. # 2, para. 14), we find that this hour should be excluded. Responding to the motion to dismiss Terri Briggs appears in no way connected to plaintiff's pursuit of his claims against the county defendants and did nothing to help plaintiff prepare to handle her as a witness.

Defendants challenge 23.8 hours that counsel for plaintiff spent in December, 1984 and January, 1985 preparing for, taking, and reviewing the deposition of Ellen Norman, one of the media defendants. This was an expedited deposition undertaken after the media defendants moved for summary judgment. Dodd decl. at para. 23. Plaintiff claims that this time is compensable because Norman was an important potential witness, as she had spoken to Bergna during the week prior to his suspension of plaintiff, immediately prior to the press conference, and again after the press conference (at least on the latter occasion allegedly inquiring into his motives for suspending plaintiff and about the location of certain documents). Exelrod decl. # 2, para. 15. We do not think Nor-

man's potential importance as a witness in plaintiff's action against Bergna and the County justifies 12.1 hours of preparation for the deposition, 8.5 hours taking the deposition, and 3.2 hours reviewing the deposition thereafter. It seems reasonable to assume that at least some of this work was related to the exploration of claims against Norman herself, and Bergna and the County should not be required to compensate plaintiff for that. In our judgment, had counsel for plaintiff focused only on issues related to the county defendants he could have prepared for, taken, and reviewed this deposition in 10 hours. Thus we recommend excluding from the fee award the additional 13.8 hours counsel purports to have devoted to this deposition.

We reject defendants' challenge to a half an hour for the item "Appeal, Pre–Briefing Conference" and a tenth of an hour for a letter to the Clerk, Court of Appeals, because defendants have presented no evidence or explanation for their contention that these times were unrelated to claims involving the county defendants. The amount of time is, in any event, de minimis.

Defendants challenge 45.3 hours that counsel for plaintiff spent opposing a motion for summary judgment (including one hour reviewing Norman's articles) in April and May, 1985, implying that this time was devoted to the motion by the media defendants. Mr. Exelrod counters that he spent this time opposing summary judgment motions filed on April 5, 1985 by the *county* defendants and that he already deleted from his fee request the time he spent opposing the media defendants' motion. Exelrod decl. # 2 at para. 16. We find that the circumstances strongly indicate that Mr. Exelrod is mistaken. Plaintiff filed his opposition to the media defendants' motion on April 18, 1985, and the hours that defendants challenge here were committed from April 2 through April 17, 1985 (Except for the hours on May 1 and May 10 for reviewing the reply to the motion, which were spent just after the media defendants filed their reply on April 30). Given the timing of the filing of the opposition to the media defendants' motion, it seems extremely likely that the work from April 2 through

April 17 was indeed spent on that opposition. Moreover, time spent by Mr. Exelrod opposing the county defendants' motions for summary judgment that was filed during this period is separately listed for May 30 through June 27, 1985, and plaintiff's opposition to those motions was filed June 27, 1985. Again, the timing of the filing of the opposition suggests that Mr. Exelrod worked on the county defendants' motion from May 30 through June 27, rather than April 2 through April 17. We thus recommend exclusion of these 45.3 hours.

We do not recommend excluding the one hour devoted to researching the defamation issues that defendants challenge in this section. This work would appear to be related to plaintiff's claim against the county defendants for defamation, which we found in Section 1, *supra*, to be reasonably chargeable to the county defendants.

Thus, we recommend exclusion of 60.1 of the hours challenged by defendants in this section.

3. Time devoted to setting aside default.

▮ Defendants challenge 11.40 hours in April and May of 1984 allegedly spent setting aside the default that the court entered for lack of prosecution by plaintiff's prior counsel, Mr. Delizonna. Mr. Exelrod responds that he devoted only 1.5 hours of this time (which he withdraws) to setting aside the default; he declares that he spent of remainder of these hours learning about the case. Exelrod decl. # 2 at paras. 11–12. Given that plaintiff is not seeking fees for any of the hours Mr. Delizonna spent on the case, it is reasonable for Mr. Exelrod to request compensation for his start-up time. We therefore reject defendants' challenge to the remainder of these hours.

4. Hours for poorly described time.

Defendants contend that 18.3 hours of Mr. Exelrod's time is too poorly described to justify payment of fees. In response to this challenge Mr. Exelrod has submitted supplemental descriptions of this time by which we are, for the most part, satisfied.

See Second Decl. of Exelrod, paragraphs 28–35. Although Mr. Exelrod confesses to not being able to remember the identity of two of the persons mentioned in the time sheets (J. Hewitt and J. Provine, accounting for a total of 2.5 hours), we recommend against exclusion of these hours because it seems unlikely that they would be billed to the wrong case and because a sufficient adjustment already has been made for possible errors of this magnitude through plaintiff's across-the-board 5% billing reduction.

### 5. Travel time.

■ Defendants challenge 43.50 hours of travel time, almost all of which was for attending depositions. We agree with Judge Patel that travel time is compensable as part of attorneys'. fees,[13] especially where, as here, counsel for the most part is requesting compensation only for half of the time he in fact spent on the road. See Exelrod decl. # 2 at paras. 36–37.

### 6. Attorney conferencing.

■ Incomprehensibly, defendants challenge the relatively few hours requested by Mr. Exelrod (6.5 hours) and Ms. Dutton (6 hours) for conferring with one another about the case over a six-month period in 1987. Given the fact that Ms. Dutton was a relatively inexperienced lawyer who would have needed guidance and supervision, and the fact that she committed during this period some 378 hours to this case, we do not think it unreasonable to compensate counsel for the very modest amount of time they are claiming for conferencing.

### 7. Focus groups.

Defendants challenge 70.3 hours spent by Mr. Exelrod doing two mock jury exercises, plus $6,556.90 in fees sought for 23.8 hours of work (at a rate of $290 per hour[14]) contributed by Jack Knebel on these same exercises.

Time devoted to exercises such as these generally is deemed compensable so long as the number of hours is reasonable. *United Steelworkers v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir.1990). However, we question the need in this case to conduct two of these exercises. Mr. Exelrod states that the first one (in July, 1990) was directed at the issue of liability, while the second one (in June of 1991) was directed at the issue of damages. Exelrod decl. # 2 at para. 44. We cannot say that conducting the second of these exercises was unreasonable, given how central the issue of damages was to this case. We are much less confident, however, about the initial exercise. On August 2, 1989, the Ninth Circuit affirmed Judge Henderson's October 14, 1987 ruling that the law was clearly established in 1982 that plaintiff was entitled to notice and a hearing before being suspended and before any suspension should have been discussed with the press. This ruling virtually assured that plaintiff victory on the *liability* aspect of the case, at least with respect to the due process claim.[15] Predictably, on April 24, 1991, plaintiff prevailed on his motion for summary judgment on this issue. Because (as noted in the next section) Mr. Exelrod and Ms. Dutton did much of the work on this summary judgment motion in 1987, Mr. Exelrod should have understood by the time of the first mock jury exercise that

**13.** *United States v. San Francisco*, 748 F.Supp. 1416, 1422 (N.D.Cal.1990).

**14.** Defendants have not specifically contested the reasonableness of this rate. We note that plaintiff has submitted a declaration from Jack Knebel, filed 1/16/92, supporting the request. Based on this uncontested declaration, we find that Knebel is a 1966 graduate of Harvard (para. 2), is a partner at McCutcheon, Doyle (para. 2), has specialized in civil rights and employment cases since 1977 (para. 3), and has a current billing rate at McCutcheon of $290 per hour (para. 5). Given these findings and our

discussion in section I, *supra*, we find the requested rate to be reasonable. It is not unreasonable to conclude, as plaintiffs did, that for mock trials of cases of this complexity and emotional density to be fully effective it is necessary to involve as the mock opposing counsel an attorney of Mr. Knebel's caliber.

**15.** The only other claims still pending at the time of the first mock jury exercise were the state law analogues to the first amendment claim, which were not dismissed until 2/11/91 on exhaustion of administrative remedies grounds.

focusing on the issue of liability likely would have been of limited cost-effectiveness.[16] We thus simply cannot find that doing both jury exercises was reasonable.

It is not clear from the time sheets which hours Mr. Exelrod spent exclusively on the first of the two exercises. It appears, however, (see page 11 to ex. 3 to the Dodd decl.) that Mr. Exelrod spent only about 20 hours on the second jury exercise after spending about 50 hours on the first. We think it fair to assume that the two exercises were not wholly separate and that much of the work setting up the first was necessary to successful completion of the second. We recommend that Mr. Exelrod be compensated for 15 of the hours he devoted to the first exercise and the 20 hours he committed to the second, for a total of 35 hours (we thus recommend that the time claimed for the mock trials be reduced by 35.30 hours).

As for Mr. Knebel, his timesheet indicates that he spent 2 hours reviewing the file (7/11/90), 12.10 hours on the first mock trial (7/12 through 7/14/90), and 9.8 hours on the second mock trial (2/21 through 6/15/91). See ex. 10 to the Rosen decl. # 1. We award Mr. Knebel the 11.8 hours spent reviewing the file and participating in the second mock trial but not the 12.10 hours he spent participating in the first mock trial.[17]

### 8. Other hours spent by Exelrod and Dutton.

Defendants challenge numerous other hours requested by Mr. Exelrod and Ms. Dutton, most of which are so minimal we question why defendants are wasting our time with them. In any event, plaintiff has adequately accounted for the .9 hour speaking to reporters on the grounds that the reporters were potential witnesses. Exelrod decl. # 2, paras. 39–40. The .10 of an hour on 2/2/87 devoted to replying to a motion for reconsideration is de minimis and covered by the 5% billing adjustment. We find that plaintiff has adequately accounted for the .4 hour of research on polygraphs and the 2 hours of research on attorneys' fees on appeal. See Exelrod decl. at paras. 42–43. Finally, as to the major item, the numerous hours spent in 1987 by Mr. Exelrod and Ms. Dutton on a supposedly unfiled motion for summary judgment, we accept Mr. Exelrod's explanation that this work contributed significantly to the summary judgment motion plaintiff actually filed in 1991. Exelrod decl. at paras. 41, 48.

### 9. Further billing judgment.

Defendants argue that, in addition to the many reductions based on their challenges to discrete items billed, the court should impose a further across-the-board billing judgment reduction of 15–20% (rather than the 5% made by plaintiff). Why the court should do this is unclear. As a great deal of the work in this case was performed single-handedly by an experienced and skilled attorney, we decline to adopt an assumption that the case was handled inefficiently. Our resolve in this matter is bolstered by the fact that plaintiff himself did a substantial amount of the basic legal work on this matter; no claim is being made for that presumptively valuable time. Finally, we suspect that if the hours requested by plaintiff's counsel really were excessive, defendants would have offered up the time sheets of their counsel by way of proof by comparison.

### 10. Fees for Morrison & Foerster.

Defendant challenges $5,000 in fees sought for work performed by attorneys

---

**16.** Although the Ninth Circuit was still considering defendant's motion for reconsideration on the liability issue, and thus liability had not yet been finally determined, it would have been prudent for Mr. Exelrod to hold off on the fairly expensive jury exercises until after the Ninth Circuit reached its final decision. Given his success when the Ninth Circuit reached its initial decision, Mr. Exelrod should have foreseen a reasonable likelihood that an expensive jury exercise on the issue of liability would have been rendered wholly unnecessary.

**17.** Defendants challenge all hours for Mr. Knebel on the ground that he served in the capacity of an expert or consultant rather than as an attorney. See defendants' opposition at 14:17–25. We find that Mr. Knebel served in a capacity that could be fairly characterized as "co-counsel" and award him fees.

from Morrison & Foerster from November, 1982 through January 1983, before plaintiff's complaint was filed. Defendants claim that these fees were incurred in connection with local administrative proceedings and hence are not recoverable under section 1988. *See Webb v. Dyer County Board of Educ.*, 471 U.S. 234, 241–43, 105 S.Ct. 1923, 1927–28, 85 L.Ed.2d 233 (1985). Plaintiff counters that Morrison & Foerster's "billing sheets clearly reflect that the work was ordinary start-up time." Reply at 9:8–11. See also billing sheets attached as ex. 10 to Rosen decl. #1. Plaintiff also notes that, while the Morrison firm's billings add up to $8,862.50, plaintiff has exercised billing judgment by only seeking $5,000.

In *Webb*, the Supreme Court held that, since a plaintiff need not exhaust administrative remedies before pursuing a lawsuit under section 1983, generally attorneys' fees incurred in pursuing relief administratively are not recoverable under section 1988. *Id.* The court did state, however, that plaintiff could recover any portion of such fees attributed to "work that was both useful and of a type ordinarily necessary to advance the civil rights litigation." *Id.*

 It is impossible to tell what percentage of the work by the Morrison firm is compensable under the *Webb* standard. The billing sheets provide absolutely no indication of the number of hours performed by each attorney on given tasks. Rather, they merely list, by date, each of the tasks the attorneys performed. And many of the individual items obviously relate to representing plaintiff in administrative proceedings and appeals.[18] Under *Webb*, such items clearly are not compensable without an explicit showing that they in fact advanced the *litigation* effort. No such showing has been made. Many of the items listed in the billing sheets relate to research for drafting the complaint and research and writing memos regarding possible federal court litigation. We would

find such items compensable if it were clear that the work done was not wasted after the Morrison firm stopped representing plaintiff. However, plaintiff has submitted no evidence showing what connection obtained, if any, between the Morrison work and what later was done in state and federal court on plaintiff's behalf. Absent such a showing, it is not fair to charge defendants for such work. Thus we recommend that the fees award by the district court not include the billing submitted on behalf of the Morrison & Foerster firm.

11. Word Processing Fees.

Defendants challenge $333 requested by Mr. Rosen's firm for 7.4 hours of word processing (at $45 per hour) by one of its employees, Paul Jarocki. Whether work of this kind is compensable under § 1988 (at market rates or on the basis of costs incurred by counsel) depends on prevailing practices in the relevant market. Faced with a similar question vis a vis paralegals and law clerks, the Supreme Court has held that "if the prevailing practice in a given community were to bill paralegal time separately at market rates, fees awarded the attorney at market rates for attorney time would not be fully compensatory if the court refused to compensate hours billed by paralegals or did so only at 'cost.'" *Missouri v. Jenkins*, 491 U.S. 274, 287, 109 S.Ct. 2463, 2471, 105 L.Ed.2d 229 (1989).

Plaintiff has submitted uncontradicted evidence sufficient to support a finding that it has become the prevailing practice in firms in the San Francisco area to bill clients separately for word processing support work in the manner reflected in the Rosen firm's billings. See Sturdevant decl. (filed 1/16/92) at para. 12; Rosen decl. #1 at para. 35; and Baum decl. (Reply appendix ex. 6) (filed 1/16/92) at para. 15 (stating that it has become common practice to bill separately for such services as word processing); see also the orders plaintiff has cited by Magistrate Judge Brennan, Judge

---

18. The billing sheet makes frequent reference to a "Skelly hearing." This is a hearing that the California Supreme Court has determined that, as a matter of due process, state and local agencies are required to give their employees before terminating or suspending them. *See Skelly v. State Personnel Bd.*, 15 Cal.3d 194, 124 Cal.Rptr. 14, 539 P.2d 774 (1975).

Karlton, and Judge Ingram that have separately awarded fees at market rates for word processing services (the issue under consideration here was not squarely discussed in any of these orders, but in each of them compensation of the kind sought by the Rosen firm was ordered). Because we have no evidentiary basis for rejecting the inference supported by the materials submitted by plaintiff on this issue, we recommend that the bill for the 7.4 hours of word processing be included in the compensation ordered by the district court.

### C. *Enhancement For Contingency.*

■ Plaintiff seeks an enhancement of the lodestar amount by a factor of 1.9 to account for the contingent nature of the case. In *City of Burlington v. Dague,* —— U.S. ——, ——, 112 S.Ct. 2638, 2643, 120 L.Ed.2d 449 (1992), the Supreme Court held that "enhancement for contingency is not permitted" under the fee-shifting statutes at issue in that case (section 7002(e) of the Solid Waste Disposal Act and section 505(d) of the Federal Water Pollution Control Act). We find the court's reasoning in that case equally applicable to section 1988 and thus recommend against awarding plaintiff an enhancement of his attorneys' fees for contingency.

### D. *Summary.*

We thus allow plaintiff's counsel the following rates and hours:

| ATTORNEY/PARALEGAL/WP | HOURS | RATE | TOTAL |
|---|---|---|---|
| Alan B. Exelrod | 2170.22 | $250 | $542,555 |
| Karen Dutton | 378.25 | 110 | 41,607.50 |
| Jonathan Gray | 76.00 | 65 | 4,940 |
| Jack Knebel | 11.80 | 290 | 3,422 |
| Sanford Jay Rosen | 9.20 | 330 | 3,036 |
| Andrea G. Asaro | 48.50 | 235 | 11,397.50 |
| Katherine Sher | 6.20 | 110 | 682 |
| Stephen Liacouras | 2.50 | 100 | 250 |
| Stephen J. Wirt | 1.20 | 90 | 108 |
| Brian Bringardner | 1.20 | 85 | 102 |
| Paul Jarocki | 7.40 | 45 | 333 |
| Morrison & Foerster | 0.00 | 0 | 0 |
| TOTAL | | | $608,433.00 |
| less 5% billing judgment | | | $578,011.35 |

---

## II. COSTS

In his bill of costs filed 10/2/91 (as amended 10/11/91), plaintiff seeks an award of $39,104.56 for Mr. Exelrod (exclusive of expert witness fees, to which plaintiff concedes he is not entitled under present law [19]). In their opposition (filed 10/11/91), defendants challenge many of the items of cost on the ground that they are not allowed under Local Rule 265–1 and 28 U.S.C. section 1920.[20] Specifically, defendants challenge plaintiff's request for (a) the costs of the mock jury exercise, (b) the cost of certain court reporter transcripts and tapes of hearings, (c) costs incident to the taking of depositions, (d) certain

**19.** In his second declaration, filed January 16, 1992, Mr. Exelrod seeks to add to his requested costs a $332 bill for the preparation and court appearance of Ronald Anderly, a criminalist specializing in fingerprints who testified at trial. It appears that Mr. Anderly was an expert witness. Thus, under *West Virginia University Hosp., Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), plaintiff is not entitled to be reimbursed for the cost of Mr. Anderly's appearance.

**20.** 28 U.S.C. section 1920 authorizes the court to tax certain costs. Local Rule 265–1, in conjunction with Appendix A to the Local Rules, sets standards for what costs a judge in this court can tax under section 1920.

costs for exemplification and copies of papers, (e) costs for the service of subpoenas and copying subpoenaed records, (f) delivery costs, (g) costs for plaintiff's lodging during trial, (h) costs for telephone calls, and (i) certain other miscellaneous· costs. In his reply (filed 10/15/91), plaintiff appears to concede that most of these items of costs are not allowable under Local Rule 265–1. Plaintiff argues, however, that section 1988 provides independent authority for the taxing of such costs.

The Supreme Court has held that 28 U.S.C. section 1920 defines "the full extent of a federal court's power to shift litigation costs absent express statutory authority to go further." *Casey, supra,* —— U.S. ——, ——, 111 S.Ct. 1138, 1141; discussing. *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). The issue is to what extent, if any, does section 1988 provide "express" statutory authorization to award items of expense that are not deemed allowable as costs under 28 U.S.C. section 1920?

■■■ Section 1988 specifies that the court can award the prevailing plaintiff "a. reasonable attorney's fee as part of the costs." Many courts have held, and the Supreme Court has acknowledged that, notwithstanding limitations imposed by 28 U.S.C. section 1920, this language authorizes as part of the attorneys' fee award "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to the fee-paying client, in the course of providing legal services." *Thornberry v. Delta Air Lines, Inc.,* 676 F.2d 1240, 1244 (9th Cir.1982) *vacated on*

*other grounds,* 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983); quoting *Northcross v. Board of Ed. of Memphis City Schools,* 611 F.2d 624, 639 (6th Cir. 1979); *see also Casey, supra,* —— U.S. at ——, n. 3, 111 S.Ct. at 1141, n. 3, 113 L.Ed.2d 68 (1991).[21] These expenses may include "[r]easonable photocopying, paralegal expenses, and travel and telephone costs." *Thornberry, supra,* 676 F.2d at 1244; quoting *Northcross, supra,* 611 F.2d at 639. However, not all expenses incurred during litigation can be considered a part of the attorneys' fees and "within the ambit of the 'liberal construction' rule which governs the application of § 1988." *Thornberry, supra,* 676 F.2d at 1245. While section 1988 applies to costs incurred by the attorney incidental to his representation of the plaintiff, it does *not* apply to "those costs incurred by a party to be paid to a third party, not the attorney for the case, which cannot be reasonably considered to be attorney's fees, [such as] docket fees, investigation expenses, deposition expenses, witness expenses, and the costs of charts and maps." *Northcross, supra,* 611 F.2d at 639; *see also Thornberry, supra,* 676 F.2d at 1245 (stating that consulting and expert witness fees also are not taxable under section 1988).[22]

We acknowledge that some courts have reached different conclusions or have appeared to have interpreted the term "out of pocket costs" more broadly than the courts in *Northcross* and *Thornberry.* Judge Patel, for example, has concluded that Title VII (and, by analogy, section 1988), independently of Rule 54(d) or 28 U.S.C. section

**21.** However, the Supreme Court in *Casey* found that the term "costs" in section 1988 had to be read consistently with 28 U.S.C. section 1920. Citing *Northcross,* the Court held that the only items of expense not authorized by 28 U.S.C. section 1920 that are allowable under section 1988 are out-of-pocket expenditures that can be characterized as part of the attorney's fee.

**22.** Prior to the Supreme Court's decision in *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), the Ninth Circuit held that, even when an item of cost was not taxable under 28 U.S.C. section 1920 and could not be awarded as part of the attorney's fee under section 1988, the trial court

had discretion to award the item under F.R.C.P. 54(d) if the court found special circumstances (for example, that expert witness testimony was indispensable in establishing the prevailing party's claim or defense). *United States v. Twin Falls,* 806 F.2d 862, 878 (9th Cir.1986), *cert. denied,* 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674. *Thornberry, supra,* at 1245; *see also, Pacific West Cable Co. v. Sacramento,* 693 F.Supp. 865, 875–77 (E.D.Cal.1988). However, in *Crawford Fitting,* the Court found that Rule 54(d) could not be read to allow costs not allowed by 28 U.S.C. section 1920. 482 U.S. at 441, 445, 107 S.Ct. at 2497, 2499; *see also Casey, supra,* —— U.S. at ——, n. 3, 111 S.Ct. at 1141, n. 3.

1920, authorizes the court to award at least consulting fees (if not expert witness fees) in special circumstances. *United States v. San Francisco,* 748 F.Supp. 1416, 1441 (N.D.Cal.1990). This conclusion, however, seems to directly contradict the Ninth Circuit's language in *Thornberry.* That language endorses the position of the Fifth Circuit in *Northcross distinguishing* (1) fees incidentally incurred by the attorney during the course of his representation *from* (2) major litigation expenses that should be deemed to be directly incurred by the plaintiff. We feel constrained to follow *Thornberry.*[23]

We turn to the task of taking up separately each of defendants' objections to plaintiff's bill of costs.

The $10,417.21 in mock jury costs clearly appears to fall within the category of "consulting fees" which the Ninth Circuit in *Thornberry* found not to be recoverable as part of attorneys' fees under Section 1988.

Defendant challenges $973.50 in costs incurred for the tape of a pre-trial hearing and certain court reporter transcripts. The cost of transcripts does not appear to be allowable as part of the attorneys' fee under the rationale applied in *Northcross.* However, plaintiff claims that two of the transcripts (for William Hoffman and Lane Liroff), costing a total of $757.50, were requested by the court and thus taxable as costs under Section III(C) of Appendix A to the local rules (which allows the costs of such transcripts where authorized by the court). Because defendants have not challenged this characterization, we recommend that the district court allow this $757.50 but exclude the remaining $186.00, which plaintiff has not argued is taxable under local rule.

Defendant's challenge $84.19 of plaintiff's claimed $11,126.20 in costs incident to taking depositions. Plaintiff concedes that $69.24 of this was for a transcript of a hearing rather than for a deposition. This cost is not allowable for the reasons stated in the prior paragraph. Moreover, because plaintiff has not contested defendants' argument that the remaining $14.95 is an overcharge resulting from a miscalculation, we recommend excluding the entire $84.19.

Defendant challenges $4,384.45 in copying costs. As stated above, courts have recognized an attorneys' copying costs as being chargeable as part of the attorneys' fee. Furthermore, plaintiff has submitted evidence that copying costs are normally charged separately to clients in the Bay Area. Keker decl. at para. 14; Baum decl. at para. 15 (both attached as exs. 5 and 6 respectively to plaintiff's appendix of evidence filed 1/16/92). Thus, we recommend allowance of these costs.

Defendant challenges $1,074.54 in costs of serving subpoenas and copying subpoenaed records, and $584.00 for service of witness subpoenas. These are not allowed under the local rule and are not part of the attorneys' fee. We recommend that they be excluded.

The $1,290.86 in delivery costs challenged by defendants are recoverable as part of the attorneys' fee. They are incidental to the services performed by the attorney, and plaintiff has provided evidence that such costs are normally billed to the client. Keker decl. at para. 14; Baum decl. at para. 15.

We see no basis in the law for awarding plaintiff his own lodging costs during the trial. We recommend that the $2,083.18 requested for this item not be allowed. Even if such a claim was legally autho-

---

**23.** We note that the Supreme Court has yet to expressly decide this issue (although it did cite the holding in *Northcross* with apparent approval). *See Casey, supra,* —— U.S. at ——, n. 3, 111 S.Ct. at 1141, n. 3. The Supreme Court *has* found that section 1988 does not authorize the awarding of expert witness fees, but that finding was very specific to that issue. The Court observed that many attorney's fees statutes specifically authorize expert witness fees and thus concluded that, where a statute does not authorize them, they should not be implied as part of the attorney's fees award. The Court found that expert witness fees as a class were treated by statutes as "a distinct category of litigation expense" that was separate from attorney's fees. *Casey, supra,* —— U.S. ——, —— – ——, 111 S.Ct. 1138, 1141–48. This reasoning does not apply to other types of litigation expenses, which are not generally given a separate statutory treatment.

rized, we would not find it reasonable, given that plaintiff lives in Santa Clara County and could have commuted to trial.

 Defendant challenges $3,336.42 requested by plaintiff for expenditures for telephone calls, $2,379.11 of which are for calls that originated from the plaintiff himself. *Northcross* and *Thornberry* recognize telephone calls as being taxable as part of the attorneys' fee, and plaintiff has provided evidence that such costs are normally billed to the client in the Bay Area legal market. Keker decl. at para. 14. We thus recommend allowing plaintiff $957.31 as out-of-pocket telephone costs incurred by Mr. Exelrod. We recommend *against* allowing plaintiff telephone costs for calls he initiated. Plaintiff argues that his telephone costs are allowable to the same extent as his attorney's because he is an attorney and incurred these costs in the course of assisting his counsel on various aspects of the case. Plaintiff cites no authority for the proposition that he is entitled to such costs. Plaintiff is not entitled to attorneys' fees for the work he performed on this case. Since the expenses that courts can tax under section 1988 are rationalized as part of the attorneys' fee, plaintiff is not entitled to these expenses.

Finally, we turn to plaintiff's "miscellaneous costs."[24] We have some difficulty determining which of these costs were incurred directly by plaintiff's counsel in connection with his representation of plaintiff. Plaintiff has provided a list of items but no evidence about how each item was used. We recommend allowing all copying expenses (i.e., copying video tapes on 7/17/90; reproducing video on 7/15/91; copying charges on 7/20/91; copying card on 8/15/91; and copying video exhibit on 8/19/91) and the expense of doing research on Westlaw[25], for a total of $362.64. We recommend disallowing the costs for the rest of the miscellaneous items on the ground that plaintiff has not made a sufficient eviden-

tiary showing that such expenses are fairly characterized as attorneys' fees.

In his motion for attorneys' fees, plaintiff seeks an additional $683.66 in costs incurred by the Rosen firm. These costs are for copying, telefaxing, delivery, taxis, and LEXIS research. See Rosen decl., para. 38, ex. D. We find all these costs allowable for the reasons set forth above.

We thus recommend awarding plaintiff $22,665.46 in costs.

### CONCLUSION

Thus, for the reasons set forth above, we recommend that the court award plaintiff $578,011.35 in attorneys' fees and $22,665.46 in costs, for a total of $600,676.81.

IT IS SO RECOMMENDED.

DATED: July 30, 1992.

---

**24.** These miscellaneous costs include the cost of an issue of the *San Francisco Banner,* the cost of video tapes of newsbroadcasts and of Chronicle newspaper clippings; the costs of duplicating many video tapes; unspecified payments to the County of Santa Clara, Stacey's Books, and Met-roPark; the cost of certain computer usage; miscellaneous copying costs; the cost of an overhead projector; and costs of using Westlaw.

